**John Burgess, OSB No. 106498**
johnburgess@lawofficeofdanielsnyder.com
**LAW OFFICES OF DANIEL SNYDER**
1000 SW Broadway, Suite 2400
Portland, Oregon 97205
Telephone: (503) 241-3617
Facsimile: (503) 241-2249

**Katharine Edwards, OSB No. 173393**
attorney@kedwards-law.com
**LAW OFFICE OF KATHARINE EDWARDS**
P.O. Box 417
Hillsboro, Oregon 97123
Telephone: (503) 908-3589

Of Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **D.A.**, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | (42 U.S.C. §1983; Negligence) |
| **STATE OF OREGON, JOSH HIGHBERGER, BRANDON KELLY, CRAIG PRINS, JEREMY WAGNER, NICK JONES, JONATHAN HYDE, MIKE HILL, C/O ACEY, NAUMANN NAWAZ, JEREMY SUMMERS, C/O SMITH, TINA WOLD, DONALD GOLDEN, NATHAN WARREN, JASON SANDLIN, GARY LONG, RICHARD WALLACE, KRISTINE GATES, JAMES THOMAS, KRYSTA LYNCH, THOMAS BRISTOL, MORIAM BALOGUN, JERRY PLANTE,** | **JURY TRIAL DEMANDED** |

and **JOHN AND JANE DOES 1-20,**

                  Defendants.


Plaintiff D.A. alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      Plaintiff D.A. brings this action under 42 U.S.C. § 1983 against the named defendants' actions for violation of the Eighth and Fourteenth Amendments to the United States Constitution by (1) failing to provide proper medical care to Plaintiff; (2) failing to follow both federal and Oregon rules and laws concerning the designation and protection of Plaintiff as a "Vulnerable" Adult-In-Custody ("AIC") at high risk for both physical and sexual assault; (3) assigning Plaintiff to share a cell with an "Aggressive Inmate," a known sexual predator serving a 48-year sentence for violent crimes including aggravated murder, animal abuse, and sex offenses against multiple women; (4) allowing Plaintiff to be physically and sexually assaulted by her known previous attacker and failing to respond to Plaintiff's pleas for help; (5) failing to provide medical treatment and legally-mandated counseling or crisis intervention services, in violation of the Prison Rape Elimination Act (PREA) protections; (6) failing to follow federal and Oregon laws and rules regarding sexual assault reporting and investigations and thereby subjecting Plaintiff to retaliation and further harm; (7) retaliating against Plaintiff for exercising constitutionally protected rights; and (8) failing to properly train and supervise subordinate staff as required by 28 CFR §115.3 I and 155.35. Plaintiff also alleges violations of her First Amendment rights by retaliating against her for filing grievances. Finally, Plaintiff also alleges supplemental state law claims of negligence. Plaintiff seeks declaratory and injunctive relief, an award of compensatory damages in an amount to be determined at trial and an award of reasonable attorney fees and costs under 42 U.S.C. § 1988.

2.      Plaintiff is a transgender woman currently in the custody of Oregon Department of Corrections ("ODOC") at Oregon State Correctional Institution ("OSCI"), a men's prison. Plaintiff notified ODOC that she is a transgender female, and her gender identity is documented in ODOC records.

3.      From approximately September 2019 to May 2020, Plaintiff suffered several physical and sexual assaults by her cellmate "A.O.," as well as daily verbal and mental abuse and control. Plaintiff was afraid for her safety to report the abuse because A.O. threatened to kill her and himself if she reported him. In May 2020, OSCI staff reassigned Plaintiff to a different housing unit because they suspected abuse against her by A.O., and assured Plaintiff that they would keep A.O. separate from her in the future.

4.      On or about September 9, 2020, prisoners from OSCI evacuated to nearby Oregon State Penitentiary ("OSP") during wildfires, and within two hours of arriving at OSP, A.O. located her and began abusing her mentally, physically, and sexually. Over the course of approximately one week at OSP, A.O. physically and sexually assaulted her multiple times, and despite Plaintiff reporting the abuse three times, staff never intervened. In the aftermath of the assaults, ODOC failed to properly respond to Plaintiff's medical and mental health needs as legally and administratively required.

5.      Throughout 2020 and 2021, ODOC further failed to provide proper medical care, including but not limited to: refusing to provide proper or timely treatment for an eye condition which ultimately required an emergency hospital visit resulting from lack of medical attention; failing to either allow Plaintiff to have contact lenses sent to her or to provide glasses, requiring her to repeatedly wear the same pair of torn, single-use contact lenses for

several weeks; and failing to properly provide access to her inhalers as prescribed and necessary for her medical conditions.

6.    Defendants have engaged in a campaign of retaliation against Plaintiff for filing grievances against staff and reporting on staff refusal to comply with COVID-19 preventative policies, including harassment and threats by staff, and disciplinary actions based on unsupported and proven false accusations, resulting in loss of privileges, loss of housing and job, loss of property, and extreme mental anguish, anxiety, and distress.

7.    Defendants are individuals who, during the time of Plaintiff's incarceration, have had authority and responsibility for her treatment, safety, and care.

8.    Plaintiff has fully exhausted her available administrative remedies.

9.    Plaintiff seeks equitable relief, compensatory and punitive damages, declaratory and injunctive relief, as well as attorney fees and costs as set forth below.

## JURISDICTION & VENUE

10.    Jurisdiction is conferred upon this Court by 28 U.S.C. §1331, federal question jurisdiction, and pursuant to 28 U.S.C. §1343(a)(3) and (4), civil rights jurisdiction.

11.    Venue is in the District of Oregon pursuant to 28 U.S.C. §1391(b) because the claim arose in this Judicial District and all Defendants are employed by ODOC in Coffee Creek Intake Center ("CCIC"), OSP, or OSCI, which are located in Washington and Marion Counties, respectively.

## PARTIES

12.    Plaintiff D.A. is a citizen of the United States. As noted above Plaintiff fears for her safety and has experienced retaliation in prison because of her gender identity. As such she is filing under the pseudonym "D.A." At all times material, Plaintiff was incarcerated in the

custody of ODOC and housed at CCIC, OSCI, or OSP in Washington and Marion Counties, Oregon, respectively.

13.     Defendant State of Oregon operates the Oregon Department of Corrections (ODOC) which owns, staffs, and operates CCIC, OSCI, and OSP.

14.     Defendant Joshua Highberger is and was at all relevant times Superintendent at OSCI. Highberger is sued in his individual and official capacities.

15.     Defendant Brandon Kelly is and was at all relevant times Superintendent at OSP. Kelly is sued in his individual and official capacities.

16.     Defendant Craig Prins is and was at all times relevant the ODOC Inspector General, Director of the ODOC Office of Population Management, and PREA Coordinator. Prins is sued in his individual and official capacities.

17.     Defendant Jeremy Wagner is and was at all times relevant a Correctional Captain and PREA Compliance Manager at the OSCI. Wagner is sued in his individual and official capacities.

18.     Defendant Nick Jones is and was at all times relevant a Correctional Captain assigned to the post of Special Population Captain at OSCI. Jones is sued in his individual and official capacities.

19.     Defendant Jonathan Hyde is and was at all times relevant a Correctional Captain assigned to the post of Operations Captain at OSCI. Hyde is sued in his individual and official capacities.

20.     Defendant Mike Hill is and was at all times relevant a Correctional Lieutenant assigned to the Security Threat Management (STM) team at OSCI. Hill is sued in his individual and official capacities.

21.    Defendant C/O Acey is and was at all times relevant a Correctional Lieutenant at OSCI. Acey is sued in his individual and official capacities.

22.    Defendant Naumann Nawaz is and was at all times relevant the Food Services Manager and a member of the STM team at OSCI. Nawaz is sued in his individual and official capacities.

23.    Defendant Jeremy Summers is and was at all times relevant a Correctional Sergeant at OSCI. He is sued in his individual and official capacities.

24.    Defendant C/O Smith is and was at all times relevant a Correctional Sergeant at OSCI. Smith is sued in her individual and official capacities.

25.    Defendant Tina Wold is and was at all times relevant an Office Specialist 2 (OS2) working in the Assignments Office at OSCI. Wold is sued in her individual and official capacities.

26.    Defendant Donald Golden is and was at all relevant times a Disciplinary Hearings Officer for ODOC. Golden is sued in his individual and official capacities.

27.    Defendant Nathan Warren is and was at all relevant times a correctional officer at OSCI. Warren is sued in his individual and official capacities.

28.    Defendant Richard Wallace is and was at all relevant times a correctional officer at OSCI. Wallace is sued in his individual and official capacities.

29.    Defendant Jason Sandlin is and was at all relevant times a correctional officer at OSCI. Sandlin is sued in his individual and official capacities.

30.    Defendant Gary Long is and was at all relevant times a correctional officer at OSCI. Long is sued in his individual and official capacities.

31.    Defendant Kristine Gates is and was at all relevant times a mental health nurse at OSCI. Gates is sued in her individual and official capacities.

32.    Defendant James Thomas is and was at all relevant times a mental health counselor at OSCI. Thomas is sued in his individual and official capacities.

33.    Defendant Krysta Lynch is and was at all relevant times a medical nurse at OSCI. Lynch is sued in her individual and official capacities.

34.    Defendant Thomas Bristol is and was at all relevant times a physician at OSCI. Bristol is sued in his individual and official capacities.

35.    Moriam Balogun is and was at all relevant times a medical nurse at OSCI. Balogun is sued in her individual and official capacities.

36.    Defendant Jerry Plante is and was at all relevant times a special investigations officer for ODOC. Plante is sued in his individual and official capacities.

37.    Defendants John and Jane Does 1-20, were at all times relevant ODOC employees assigned to work at OSCI, the OSP, or Coffee Creek Intake Center (CCIC), who were personally involved in the violations alleged herein but whose identities are currently unknown to Plaintiff. Once Plaintiff learns the identities of the Doe Defendants through discovery, he will amend this Complaint to substitute the proper names and titles for the Doe pseudonyms. All Doe Defendants are sued in their individual and official capacities.

38.    At all times relevant, Defendant's employees and supervisors, as their conduct is alleged herein, were acting within the course and scope of their employment with the Defendant.

39.    All defendants are sued in their individual capacity.

**FACTUAL BACKGROUND**

40.     On or about April 2, 2019, Plaintiff was transferred to the legal and physical custody of the ODOC and housed at CCIC until May 2, 2019.

41.     Plaintiff entered ODOC custody on non-violent offense convictions with a June 27, 2023, release date, and has no history of prior violent offenses.

PHYSICAL AND SEXUAL ASSAULTS

42.     Plaintiff has a slight build, youthful features, and feminine presentation.

43.     While confined at CCIC, Plaintiff was screened for risk of sexual victimization.

44.     Given plaintiff's vulnerability to sexual victimization, Defendant Does should have designated Plaintiff as a "Vulnerable Inmate."

45.     Plaintiff believes that Defendant Does did not identify or designate her for vulnerability to sexual abuse in ODOC custody.

46.     On or about May 2, 2019, Plaintiff was transferred to the Oregon State Correctional Institution (OSCI).

47.     Soon after Plaintiff's May 2, 2019, transfer to OSCI, Plaintiff was questioned by OSCI staff concerning Plaintiff's gender identity. Plaintiff admitted to identifying as transgender, but not publicly within the prison system for fear of physical and sexual abuse. At some point thereafter, plaintiff was designated as a transgender female in ODOC's records.

48.     Defendant Does conducted a second screening for Plaintiff's risk of sexual victimization soon after her May 2, 2019, transfer to OSCI.

49.     Defendant Does should have designated Plaintiff as a "Vulnerable Inmate" upon arrival at OSCI. Plaintiff believes that Defendant Does did not identify or designate her for vulnerability upon arrival at OSCI despite her obvious risk factors for victimization.

50.     Upon Plaintiff's May 2, 2019, arrival at OSCI, A.O. had been confined at OSCI since June 11, 2018, with criminal convictions and prior criminal history including violent sexual offenses, assaults, animal abuse, and murder. Upon information and belief, A.O. suffers severe mental, emotional, and anger control issues.

51.     Given A.O.'s violent criminal history, violent commitment offenses, and assaultive prison disciplinary violations, Defendant Does should have designated and identified him as an "Aggressive Inmate."

52.     Upon information and belief, Defendant Does did not identify or designate A.O. as an "Aggressive Inmate," within the meaning of ODOC Policy.

53.     On or about September 3, 2019, Defendants Wagner, Jones, Wold, and Does approved and facilitated A.O.'s move into the same housing unit and onto the same tier as Plaintiff, thereby housing an "Aggressive Inmate" with a "Vulnerable Inmate."

54.     On or about October 28, 2019, Defendants Wagner, Jones, Wold, and Does moved Plaintiff, a "vulnerable inmate" into the same cell with A.O., an "aggressive inmate."

55.     Defendants Wagner, Jones, Wold, and Does improperly allowed and facilitated Plaintiff, a "Vulnerable Inmate," and A.O., an "Aggressive Inmate," to remain housed together in a cell from approximately October 28, 2019, until approximately June 16, 2020.

56.     Between October 28, 2019, and June 16, 2020, A.O. repeatedly subjected Plaintiff to emotional, verbal, physical, and sexual assaults, and extreme psychological control on a daily basis.

57.     A.O. repeatedly told Plaintiff that he would beat, maim, and even kill Plaintiff and himself, or locate Plaintiff's family outside ODOC and harm them if Plaintiff ever reported the abuse.

58.     On or about June 16, 2020, several AICs in neighboring cells overheard A.O. physically and sexually assaulting Plaintiff and reported A.O.'s physical and sexual assault of Plaintiff to Security Threat Management (STM) staff, Defendant Nawaz.

59.     On or about June 16, 2020, Defendant Nawaz alerted STM Lieutenant Defendant Hill of A.O.'s June 2020 physical and sexual assault of Plaintiff and on or about June 16, 2020, Defendants Nawaz and Hill questioned Plaintiff.

60.     Having heard A.O.'s repeated threats to kill himself or Plaintiff and her family if she ever told anyone about A.O.'s abuse, Plaintiff was too afraid to disclose the abuse to Defendants Hill and Nawaz.

61.     Defendant Hill told Plaintiff that he "had a gut feeling" that A.O. was physically and sexually abusing Plaintiff and that he had "developed a sixth sense about these things" even if plaintiff was too afraid to share details of the abuse with them. Defendant Hill informed Plaintiff that he was assigning Plaintiff and A.O. to different housing units and entering an official order into the ODOC computer to keep Plaintiff and A.O. separate because he suspected that A.O. was abusing Plaintiff.

62.     Despite Defendant Hill informing Plaintiff that he was entering an official order into the ODOC computer to keep Plaintiff and A.O. separate because he suspected that A.O. was physically and sexually abusing Plaintiff, Defendants Hills, Nawaz, Jones, Wagner, or Does failed to move A.O. to a different facility, instead moving Plaintiff to a different unit, Unit 11 dorm, at OSCI.

63.     On or about June 18, 2020, Defendants Acey, Hill, Wagner, Jones, Wold or Does then improperly authorized and facilitated A.O.'s move to the Unit 11 dorm, only four bunks away from Plaintiff's assigned bunk despite having moved plaintiff out of a shared cell

with A.O. and onto Unit 11 to separate plaintiff from A.O.'s abuse. A.O. remained on Unit 11, only four bunks away from plaintiff, for five days, until June 23, 2020.

64.    Individuals housed in the Unit 11 dorm, including Plaintiff and A.O., must share a single, common, unsecured bathroom. Individuals housed in the 11 dorm, including Plaintiff and A.O., shower together in the unit's shared five-stall shower. As such, plaintiff was forced to encounter her abuser during unclothed, vulnerable toilet and hygiene activities for five days.

65.    Plaintiff suffered tremendous fear and anxiety knowing that Defendants Acey, Hill, Nawaz, Wagner, Jones, Wold or Does would move A.O. four bunks away from Plaintiff in an unsecured dorm setting even though they knew that it was necessary to keep them separate because A.O. had physically and sexually assaulted Plaintiff.

66.    On or about June 23, 2020, A.O. entered disciplinary segregation until the following day, when he was released and assigned to be housed in a different unit at OSCI.

67.    Between June 24, 2020, and September 8, 2020, Defendants Acey, Hill, Nawaz, Wagner, Jones, and Does authorized and facilitated A.O. to work in the OSCI dining room on the serving line. A.O. sought Plaintiff out in the OSCI dining room every day during each mealtime that he worked, passing Plaintiff notes either directly or through other dining room workers. Plaintiff was forced to see and interact with A.O. in the OSCI dining room every day at each meal between June 24, 2020, and September 8, 2020.

68.    Plaintiff suffered constant extreme fear and anxiety due to being forced to see and interact with A.O. each day at OSCI. Plaintiff remained hyper-vigilant and consciously attempted to limit her movements throughout OSCI in hopes of limiting A.O.'s ability to see and force Plaintiff to interact with him.

69.     On information and belief, on at least one occasion between June 24, 2020, and September 8, 2020, OSCI staff facilitated his move back into Unit 11 so that he would have physical access to Plaintiff again. Upon information and belief, Defendant Hyde blocked A.O.'s attempt to move back to Unit 11.

70.     Between June 24, 2020, and September 8, 2020, Defendant Hyde assured Plaintiff that A.O. would not be allowed to move back into the same unit as plaintiff.

71.     On or about September 8, 2020, the entire OSCI population and the populations of two nearby prisons, totaling approximately 1,450 individuals, were evacuated to Oregon State Penitentiary (OSP), a maximum-security prison located approximately four miles from OSCI, due to wildfires.

72.     At approximately 12:00 p.m. on September 8, 2020, AICs evacuated from OSCI and the other two prisons, including plaintiff and A.O., were released into the secure outdoor perimeter of OSP and locked on the outdoor recreation yard for the rest of the day, until housing space was found for them within the facility. The last OSCI AICs to be housed at OSP were not allowed to leave the OSP recreation yard until well after 3:00 a.m. on September 9, 2020.

73.     Within approximately one hour of plaintiff arriving on the OSP recreation yard, A.O. located Plaintiff, grabbed her arm, sat down next to her, pinched her on the back of the arm hard enough to cause bruising, and forced her to sit and talk with him. When Plaintiff tried to walk away from A.O., A.O. forcefully grabbed Plaintiff's arm and told Plaintiff that if she said anything, he would "make sure [Plaintiff would] never walk again" and said that he would kill Plaintiff and himself.

74.     Plaintiff had nowhere else to go to escape A.O. A.O. forced Plaintiff to sit next to him, threatening her for many hours, until approximately 2:30 a.m. on September 9. Plaintiff was too afraid of A.O. to call out for help and there were no staff nearby to call out to.

75.     It would not have been possible for A.O. to have had contact with Plaintiff at OSP if Defendants Hill, Nawaz, Wagner, Jones, or Does had properly transferred A.O. out of OSCI in June 2020 when Defendant Hill informed Plaintiff that he was assigning Plaintiff and A.O. to different housing units and entering an official order in the ODOC computer to keep them separated because Hill suspected that A.O. was physically and sexually abusing Plaintiff.

76.     When plaintiff was finally allowed to enter OSP's interior at approximately 2:30 a.m. on September 9, 2020, Plaintiff was assigned to sleep on a mattress on the floor of "A3," the prison's incentive housing unit commonly known as "A-Block."

77.     Defendant Does authorized and facilitated A.O. being assigned to sleep in A-Block along with Plaintiff, on a mattress on the floor with only two people assigned to sleep between Plaintiff and A.O.

78.     Plaintiff was terrified, fearing for her physical safety and life, having A.O. assigned to a mattress so close to her in an unsecured dorm-like setting with people just inches apart.

79.     Defendants Hill, Hyde, Jones and Does were physically present at OSP on several occasions while OSCI AICs stayed there between September 8, 2020, and September 14, 2020. Defendants Hill, Hyde, Jones or Does failed to make any effort to remove A.O. or Plaintiff from A3 at OSP and house them in different locations at any time between September 8, 2020, and September 13, 2020.

80.     On the morning of September 10, 2020, A.O. woke Plaintiff and punched her in the face a few seconds later.

81.     While housed on A3, A.O. forced Plaintiff to shower with him. The A3 shower has four shower heads and no physical dividers or curtains, so that four AICs shower at one time in the physical presence and sight of all other showering AICs.

82.     Plaintiff asked Defendant Doe for the opportunity for a private shower. Defendant Doe responded "this is all we got, man. Just get in."

83.     A.O. and the other male AICs who Plaintiff was forced to shower with made sexual comments about Plaintiff which made Plaintiff feel harassed, humiliated, ashamed, and frightened. Plaintiff felt so frightened, ashamed and humiliated being forced to be nude and exposed in the presence of A.O. and other AICs that she became visibly emotional and wept in the shower.

84.     On or about September 11, 2020, A.O. pushed Plaintiff into an unoccupied A3 cell. A.O. punched Plaintiff in the face twice, grabbed her in a tight chokehold, and sexually assaulted Plaintiff. A.O. then pinned plaintiff onto the bed and attempted to rape her.

85.     A.O.'s attack on Plaintiff was interrupted by another OSCI AIC who told A.O. and Plaintiff to get out of the empty cell, which allowed Plaintiff to escape A.O.'s grip and flee the cell.

86.     After A.O. sexually assaulted Plaintiff on September 11, 2020, she felt terrified and desperate for protection.

87.     On the morning of September 12, 2020, Plaintiff called the ODOC PREA hotline, from an AIC pay phone to report A.O.'s physical and sexual abuse. Realizing that she

did not leave her name during the first PREA phone call, Plaintiff called the PREA hotline a second time approximately 2-3 minutes later, leaving her name during the second call.

88.    Plaintiff stated during the September 12, 2020, PREA hotline calls that she needed to get in touch with OSCI Captain Defendant Hyde because she trusted that Defendant Hyde would help her.

89.    After making the September 12, 2020, PREA hotline calls, Plaintiff waited for the appropriate staff to arrive and remove her from danger. Nobody came to Plaintiff's assistance or communicated with Plaintiff in any way in response to the September 12, 2020, PREA hotline calls.

90.    On information and belief, A.O. was placed in disciplinary segregation at OSP on the afternoon of September 13, 2020.

91.    On information and belief, Defendants Kelly, and Highberger failed to implement a safety plan in the event of facility evacuations prior to the 2020 wildfires, and when evacuations became necessary, failed to ensure the safety of incarcerated individuals in their care who were forced to evacuate.

92.    Plaintiff and the other AICs from Unit 11 returned to OSCI on Monday, September 14, 2020.

93.    On September 14, 2020, Plaintiff's face still appeared bloody and bruised from being physically assaulted by A.O.

94.    Between September 11 and September 14, 2020, Plaintiff walked past numerous OSP and OSCI staff members, Defendant Does, but none of them asked Plaintiff what happened, if she was okay, or if she required medical attention.

95.     Plaintiff did not know if A.O. had been returned to OSCI and would seek her out to hurt or kill her, and she was filled with extreme anxiety and fear.

96.     On September 14, 2020, after returning to OSCI, Plaintiff sent an AIC Communication form ("kyte"), requesting a PREA investigation.

97.     On September 14, 2020, Plaintiff saw Defendant Nawaz in the OSCI dining room during the afternoon meal. Defendant Nawaz asked Plaintiff about her facial bruising and asked if she needed help. Defendant Nawaz was the first ODOC staff member to acknowledge or comment on Plaintiff's visible injuries in the three days since she had been attacked and injured.

98.     Plaintiff told Defendant Nawaz that she did not want to talk about it in the dining room where other AICs could overhear and that she needed to talk to Defendant Hyde. Defendant Nawaz told Plaintiff that he would contact Defendant Hyde for Plaintiff. By the evening of September 14, 2020, Plaintiff still had not heard from Defendant Hyde or anyone else regarding the attacks or Plaintiff's PREA requests.

99.     Due to Defendant Hyde's lack of communication, Plaintiff placed a third call to the PREA hotline on the evening of September 14, 2020.

100.    Plaintiff never received a response to any of her three PREA hotline calls. A few days later, Plaintiff saw Defendant Hyde and told him that Plaintiff urgently needed to speak with him and that she had left messages on the PREA hotline requesting to talk to him and asked if he knew what was going on. Defendant Hyde told Plaintiff that he had "gotten the email but [had] a lot going on" at the moment because of the wildfire evacuations and he had not "had time to get to it."

101.    In response to the AIC Communication Plaintiff had sent requesting a PREA investigation, Defendant Sergeant Summers interviewed Plaintiff and finally took photographs of her face, on or about September 15 or 16, 2020.

102.    By this time, Plaintiff's injuries were nearly one week old. Defendant Summers told Plaintiff that he did not normally handle PREA investigations and was not sure how to log the information.

103.    On or about September 17, 2020, Defendant Sergeant Smith interviewed Plaintiff as part of the PREA investigation. Plaintiff began to tell Defendant Smith about the assaults. Defendant Smith stopped Plaintiff and told her that she would follow up later because Smith had another engagement at that moment and could not continue talking with Plaintiff.

104.    On or about September 19, 2020, Plaintiff submitted a grievance form regarding "'PREA Compliance' for the period of 9/8/20-9/15/20," which was thereafter marked "Accepted" for processing by the OSP Grievance Office and assigned case number OSP_2020_09_176, which plaintiff fully exhausted.

105.    On or about September 21, 2020, OSCI PREA Compliance Manager, Defendant Wagner told Plaintiff that Defendant Smith had improperly recorded A.O.'s attacks against Plaintiff in ODOC's system as only physical assaults, not sexual assaults, and that a PREA investigation had never been commenced. Defendant Wagner told Plaintiff that he would create a new report to record the sexual assaults against Plaintiff and finally start a PREA investigation.

106.    On or about September 23, 2020, or September 24, 2020, Defendant Smith interviewed Plaintiff a second time and a PREA investigation was finally commenced.

107.    On or about October 30, 2020, Plaintiff received a letter from A.O., which A.O. had sent to Plaintiff through the mail from Snake River Correctional Institution (SRCI), postmarked October 20, 2020. In the October 20 letter, A.O. made veiled threats seeking to intimidate Plaintiff from cooperating in the PREA investigation that had been initiated against him.

108.    On or about October 30, 2020, Plaintiff informed her attorney about the letter she had received from A.O. and Plaintiff's attorney contacted the Department of Justice (DOJ). DOJ attorneys acknowledged that there should have been a block in place to prevent A.O. from sending mail to Plaintiff but admitted that there had not been one in place until DOJ instructed Defendant Does to implement one on or about October 30, 2020.

109.    Thereafter, approximately three more letters from A.O. were delivered to Plaintiff at OSCI.

110.    Prison officials have since intercepted at least three addition letters A.O. sent to Plaintiff since Defendant Does activated the DOJ-requested mail block on or about October 30, 2020.

111.    Plaintiff continues to suffer severe and constant fear and anxiety that A.O. is behind her or will have Plaintiff attacked while she remains in ODOC custody. Plaintiff now suffers from an inability to sleep, social anxiety, and fear. Plaintiff has been diagnosed with post-traumatic stress disorder (PTSD).

112.    Defendant Does have failed to provide Plaintiff timely and adequate emotional and mental health care to help her resolve and cope with the trauma she has suffered as a result of the physical and sexual assaults of A.O., despite her repeated requests for proper mental health care from defendants Gates, Thomas, and Does.

MEDICAL NEGLECT

113.    After approximately one year of intermittent eye problems, on or about August

10, 2020, Plaintiff began experiencing, among other symptoms, severe eye pain, pressure,

blurred vision, discharge, and headache, which worsened in severity over the following week.

114.    Despite repeated requests for medical attention, ODOC medical staff, including

defendants Bristol, Balogun, Lynch, and Does failed to properly or timely examine or treat

plaintiff's condition.

115.    Throughout the day on August 17, 2020, plaintiff made multiple requests to

receive medical care. Nursing staff told plaintiff the medical staff did not have time to address

her medical needs at that time and to send a request for a medical appointment to be scheduled

at some point in the future.

116.    Plaintiff's condition worsened throughout the day and into the evening of

August 17, but she still could not obtain medical attention despite ongoing requests to medical

staff.

117.    On the morning of August 18, 2020, plaintiff crossed paths with a nurse,

"Carrie," in the prison hallway and Carrie told Plaintiff that her eyes looked bad enough that

she needed to go to the hospital immediately. Carrie contacted appropriate staff and arranged

for plaintiff to be transported to the Emergency Department at Santiam Hospital within the

hour.

118.    Emergency Department physicians lacked appropriate equipment to properly

diagnose Plaintiff's condition, but tentatively diagnosed her with iritis and uveitis, and

recommended follow-up with an ophthalmologist within two days. On August 20, 2020,

Plaintiff saw an ophthalmologist who prescribed Prednisolone drops and recommended additional follow-up.

119.    On September 15, 2020, plaintiff saw an ophthalmologist at Salem Eye Clinic who recommended additional follow-up in three to four weeks and monthly thereafter. Plaintiff was never taken back for any ophthalmologic follow-up or treatment, despite ongoing symptoms and multiple requests to ODOC medical staff.

120.    In November 2020, Plaintiff's Prednisolone ran out and her prescription for Prednisolone expired despite instructions from both the prescribing ophthalmologist and the Prednisolone bottle not to abruptly discontinue use. Plaintiff repeatedly alerted ODOC medical staff, including defendants Lynch, Balogun, Bristol, and Does that her Prednisolone had run out before she had received any follow-up instructions, and that she was having ongoing symptoms and required follow-up care. Defendants did not address Plaintiff's symptoms or schedule a follow-up appointment with an ophthalmologist.

121.    In November 2020, Plaintiff received authorization for her mother to send contact lenses into OSCI for Plaintiff to use. Plaintiff did not own any eyeglasses and requires vision correction for basic daily life. Upon information and belief, Plaintiff's mother sent the approved contact lenses and they arrived at OSCI on December 3, 2020. Defendant Does misplaced the package for more than two months.

122.    In December 2020, Plaintiff requested authorization for her mother to send a second box of contact lenses to OSCI after OSCI staff could not locate the previous shipment. Defendants Lynch and Does refused to authorize a second shipment because Plaintiff's original Prednisolone prescription advised against contact lens use while using the drops. Plaintiff had not used the drops since the prescription expired and again requested

ophthalmologic follow-up care as recommended by the ophthalmologist but was again denied. Plaintiff requested to have glasses made and was told she would have a visit with an optometrist, but this visit did not occur until May 21, 2021, despite multiple requests in the meantime to Defendants Lynch, Bristol, Balogun, and Does.

123.    Plaintiff could not function properly or work at her assigned job without vision correction, but without eyeglasses, Plaintiff was forced to continue wearing the same single pair of contact lenses until late February 2021. Plaintiff's contact lenses were single-use daily disposable lenses, intended to be worn for only one day and then replaced with a fresh pair. In December 2020, one of Plaintiff's contact lenses developed a tear, but without glasses or replacement lenses, Plaintiff was forced to continue using those same contact lenses repeatedly to function with adequate vision, causing daily discomfort.

124.    From December 2020 until late-February 2021, Plaintiff made numerous requests for glasses, authorization to receive new contact lenses, and follow-up care with an ophthalmologist, none of which she obtained. Plaintiff further made numerous complaints of ongoing eye symptoms, including pain, light sensitivity, discharge, vision disturbances, and headaches, in addition to extreme discomfort from wearing old, torn lenses.

125.    Plaintiff never returned to the ophthalmologist for follow-up care and has suffered ongoing pain and vision loss, as well as intermittent redness and discharge, as a result of Defendants' failure to provide proper ophthalmologic care and proper vision correction aids.

/ / /

/ / /

/ / /

PAGE 21 - **COMPLAINT**

RETALIATION

126.    On or about June 24, 2020, Plaintiff filed a petition for habeas corpus in Oregon state court, on the basis of OSCI and ODOC's failures to take adequate precautions to prevent the spread of COVID-19.

127.    Throughout the duration of her state habeas corpus case, Plaintiff utilized the assistance of OSCI law library staff, including AICs employed in the law library. Upon information and belief, law library staff, including AICs employed in the law library, assisted Plaintiff with legal research and navigating the grievance system, within the bounds and duties of law library staff. Plaintiff relied on the promised confidentiality of her communications with law library staff when discussing details of her habeas corpus case.

128.    After Plaintiff was sexually assaulted in September 2020, Plaintiff continued to utilize the services provided by law library staff to file appropriate grievances and other documents related to her PREA case. She also relied on the advice and guidance by law library staff to assist her in navigating the PREA policies and mechanisms in place.

129.    Plaintiff experienced extreme trauma from suffering sexual assaults, and she feared being targeted by other AICs should rumor of the assaults spread, making discretion and privacy particularly important in her interactions with legal library staff. Plaintiff relied on the promised confidentiality of her communications with law library staff when divulging details of the assaults.

130.    Upon information and belief, ODOC commenced an investigation into AIC law library assistant Mark Wilson at some point in December 2020 for reasons unrelated to Plaintiff. Upon information and belief, during its investigation into AIC Wilson, ODOC and Defendant Jerry Plante confiscated and reviewed confidential and privileged documents

PAGE 22 - **COMPLAINT**

prepared or held by AIC Wilson in connection with his law library duties, including notes, pleadings, and other confidential materials related to AIC Wilson's law library duties.

131.    Upon information and belief, ODOC and Defendant Plante confiscated confidential and privileged materials belonging to Plaintiff or related to Plaintiff's legal cases which AIC Wilson had legitimately held in the course of his law library work with Plaintiff. The materials included notes documenting specific details of Plaintiff's habeas corpus and PREA cases, pleadings, and other documents related to Plaintiff's confidential matters. The documents contained private, sensitive, confidential, and privileged information, including details of the assaults Plaintiff suffered as well as specific named staff members involved in Plaintiff's cases.

132.    On or about April 2, 2021, Plaintiff was handcuffed and arrested in front of around 100 other AICs while on her way to work at the facility Print Shop, for reasons unknown to Plaintiff. Plaintiff was placed in the Disciplinary Segregation Unit ("DSU"), still unaware of the reason for the arrest. Later that day, Defendant Wagner told Plaintiff that she was being held pending investigation into "allegations" against her but refused to inform Plaintiff of any other details or even the nature of the allegations. Plaintiff remained in DSU for approximately two weeks before she learned that another AIC had made allegations of a sexual nature against her, but still did not receive any more specific information relating to the details of the allegations or the investigation.

133.    Approximately 30 days after being placed in DSU, Plaintiff finally learned that she had been placed in DSU pending investigation on the order of Defendants Long and Wagner after another AIC Antonio Villanueva made unsupported allegations to Defendant Sandlin that Plaintiff had fondled his penis in the dorm where both were housed.

134.    Upon information and belief, AIC Villanueva had a prior history known to the ODOC staff of making false accusations of sexual misconduct against other AICs to manipulate his housing assignments. Despite AIC Villanueva's history, and eyewitness testimony supporting Plaintiff's innocence, Defendants Highberger, Wagner, Long, and Does placed Plaintiff in DSU for 11 weeks until AIC Villanueva's allegations were eventually deemed unsubstantiated, and AIC Villanueva was transferred to a different facility.

135.    While she was held in DSU, ODOC failed to provide Plaintiff with any administrative hearing for more than seven weeks, in violation of ODOC policy, Oregon Administrative Rules, and Plaintiff's due process rights. When ODOC finally provided an administrative hearing on or about May 26, 2021, staff provided her with a document with a falsified prior date of May 3, 2021, listed as the date of her release from DSU despite her ongoing housing in DSU, signed by defendants Long and Wagner.

136.    Defendants Wagner, Long, and Does placed Plaintiff in DSU and unnecessarily and deliberately extended their investigation into the allegations against her in retaliation for the private information contained within Plaintiff's legal materials confiscated and reviewed by Defendant Jerry Plante.

137.    While in DSU, Plaintiff suffered anxiety, depression, distress, and mental anguish. Her mental distress was amplified by the lack of information provided to her for the first 30 days, whereby she did not even know why she was being held. Plaintiff's mental anguish was also intensified by her PTSD and trauma related to her prior sexual assaults and lack of mental health care, causing her mental health symptoms to increase substantially while she remained in DSU.

PAGE 24 - **COMPLAINT**

138.    While in DSU, Plaintiff's mental health declined significantly. Despite Plaintiff's numerous requests for mental health care from Defendants Gates, Thomas, and Does, she never received proper trauma counseling or mental health care while housed in DSU or after.

139.    Though she was eventually found not guilty of the sexual assault and released from DSU after 11 weeks, she lost her housing assignment, job assignment, wages, and property. She also suffered extreme distress and anguish.

140.    On or about October 12, 2021, Plaintiff received a misconduct report accusing her of participating in non-assaultive sexual activity by kissing another AIC from her housing unit, Robert Kahler. The initial misconduct report, drafted by Defendant Wagner and relying on input from defendants Sandlin and Wallace, report stated that Defendant Wagner had reviewed all available security camera footage and confirmed that he personally observed the kissing activity.

141.    In the resulting misconduct hearing, hearings officer Defendant Golden claimed to have also reviewed all available security camera footage and to have personally observed the kissing activity. Defendant Golden refused to show the footage or still-shot photos of the footage depicting the kissing activity to Plaintiff. Defendant Golden found Plaintiff guilty of the misconduct, of which Plaintiff did not engage.

142.    Security footage of the incident in question depicts Plaintiff and AIC Kahler talking while Plaintiff wore a face mask. At no time during the period in question does security footage depict Plaintiff and AIC Kahler kissing or engaging in any type of sexual or prohibited activity.

143.    ODOC staff, including Defendants Wagner, Golden, and Does falsified a misconduct report against Plaintiff in retaliation for the private information contained within Plaintiff's legal materials confiscated and reviewed by Defendant Jerry Plante and provided to others within ODOC.

144.    On or about October 30, 2021, Plaintiff saw Defendant Highberger in the prison and explained the events surrounding the October 25, 2021, discipline. Defendant Highberger told Plaintiff he would investigate the discipline himself and instructed Plaintiff to file an appeal for the discipline.

145.    On or about November 5, 2021, Plaintiff submitted an appeal to request secondary review of the discipline but the request for review was denied and neither Highberger nor other ODOC staff reviewed the discipline.

146.    As a result of being found guilty of the October 25, 2021, misconduct report and without any avenue to challenge the wrongful discipline, Plaintiff suffered loss of privileges and housing assignment, fines, shame, anxiety, and mental anguish.

**COUNT I**

**(42 U.S.C. §1983 – Eighth Amendment – Failure to Protect)**

**(Against Defendants ODOC, Highberger, Kelly, Prins, Wagner, Jones, Hyde, Acey, Hill, Nawaz, Summers, Smith, Wold, and Does)**

147.    Plaintiff re-alleges all relevant paragraphs as though fully restated herein.

148.    Plaintiff is entitled to the full protection of the laws including the Prison Litigation Reform Act and the Prison Rape Elimination Act, which requires ODOC and defendants to comply with the laws in providing protection from assault including physical

assaults and rape, providing protection to vulnerable prisoners, and to comply with all aspects of intervening and providing a safe environment to Plaintiff.

149.    The acts and omissions of Defendants from April 2, 2019, to the present, alleged herein constitute deliberate indifference to the substantial risk to Plaintiff's physical safety and life caused by repeated physical and sexual assaults by A.O. from October 28, 2019, to September 13, 2020, and ongoing contact by A.O. through October 30, 2020.

150.    Defendants violated the Constitutional and statutory rights held by Plaintiff in the following ways:

a)    Failing to identify and designate Plaintiff as a "Vulnerable Inmate" at CCIC between April 2, 2019, and May 2, 2019;

b)    Failing to identify and designate Plaintiff as a "Vulnerable Inmate" at OSCI between May 2, 2019, and October 28, 2019;

c)    Failing to identify and designate Plaintiff as a "Vulnerable Inmate" at OSCI between October 28, 2019, and September 13, 2020;

d)    Failing to identify and designate A.O. as an "Aggressive Inmate" prior to October 28, 2019;

e)    Failing to identify and designate A.O. as an "Aggressive Inmate" between October 28, 2019, and June 16, 2020;

f)    Failing to identify and designate A.O. as an "Aggressive Inmate" between June 16, 2020, and September 13, 2020;

g)    Authorizing and facilitating A.O.'s September 3, 2019, move placing him, an "Aggressive Inmate," eleven cells from Plaintiff, a "Vulnerable Inmate";

h)  Authorizing and facilitating the October 28, 2019, assignment of Plaintiff, a
    "Vulnerable Inmate," to a cell with A.O., an "Aggressive Inmate";

i)  Failing to review Plaintiff's continuing housing assignment in a cell with
    A.O., an "Aggressive Inmate," in between October 28, 2019, and June 16,
    2020;

j)  Failing to conduct a timely and proper PREA investigation between June 16,
    2020, and the present, into A.O.'s suspected physical and sexual assaults of
    Plaintiff between October 28, 2019, and June 16, 2020;

k)  Failing to properly enter a "Conflict" order between Plaintiff and A.O.
    between June 16, 2020, and September 13, 2020;

l)  Failing to transfer A.O. out of OSCI between June 16, 2020, and September 8,
    2020, upon concluding that Plaintiff and A.O. must be housed separately and
    kept away from each other due to A.O.'s suspected physical and sexual
    assaults of Plaintiff;

m)  Authorizing and facilitating A.O.'s June 18, 2020, move to the Unit 11 dorm,
    four bunks away from Plaintiff, despite having ordering that Plaintiff and A.O.
    be housed separately due to A.O.'s suspected physical and sexual abuse of
    Plaintiff;

n)  Authorizing and facilitating A.O.'s continued housing assignment in the Unit
    11 dorm, four bunks away from Plaintiff on June 18, 2020, until June 23,
    2020, despite having ordering that Plaintiff and A.O. be housed separately due
    to A.O.'s suspected physical and sexual abuse of Plaintiff;

o)   Authorizing and facilitating A.O.'s June 24, 2020, release from disciplinary segregation back into the OSCI general population;

p)   Authorizing and facilitating A.O.'s continuing contact with, and harassment of, Plaintiff at OSCI between June 24, 2020, and September 8, 2020;

q)   Failing to implement an adequate emergency evacuation plan to ensure the safety of AICs during evacuations either in advance of or during the September 2020 wildfire evacuations;

r)   Authorizing and facilitating A.O.'s contact with, and physical abuse of, Plaintiff on the OSP recreation yard from approximately 12:00 p.m., on September 8, 2020, through 2:30 a.m., on September 9, 2020;

s)   Authorizing and facilitating A.O.'s OSP housing assignment just a few feet from Plaintiff on September 9, 2020;

t)   Authorizing and facilitating A.O.'s continuing housing assignment just a few feet from Plaintiff from September 9, 2020, until September 13, 2020;

u)   Authorizing and facilitating A.O.'s repeated physical and sexual abuse of Plaintiff at OSP from September 9, 2020, until September 13, 2020;

v)   Failing to afford Plaintiff the opportunity to shower separately from A.O. and other AICs between September 9, 2020, and September 14, 2020;

w)   Failing to conduct a timely and proper PREA investigation between September 12, 2020, and the present, into A.O.'s physical and sexual abuse of Plaintiff at OSP between September 8, 2020, and September 13, 2020;

x)   Failing to timely and properly monitor and block A.O.'s mail between September 12, 2020, and October 30, 2020, allowing him to contact Plaintiff;

y)  Failing to afford Plaintiff timely and adequate emotional and mental health counseling to help her heal from the trauma she suffered as a direct and proximate result of A.O.'s physical and sexual assaults between October 28, 2019, and September 13, 2020, and ongoing contact from September 12, 2020 until October 30, 2020.

151.   The individually named defendants acted with deliberate indifference to Plaintiff's constitutional rights. As a result of defendants' conduct, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress.

152.   Plaintiff is entitled to damages to compensate her for these injuries.

153.   Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

154.   Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

**COUNT II**

**(42 U.S.C. §1983 – Eighth Amendment – Failure to Adequately Train**

**& Supervise Subordinate Staff)**

**(Against Defendants Highberger, Kelly, Prins, Wagner, and Does)**

155.   Plaintiff re-alleges all relevant paragraphs as though fully restated herein.

156.   The acts and omissions of Defendants Highberger, Kelly, Prins, Wagner, and Does from April 2, 2019 to the present, alleged herein constitute deliberate indifference to the substantial risk of sexual assault of "Vulnerable Inmates" by "Aggressive Inmates" in violation of the Eighth and Fourteenth Amendments to the United States Constitution, by

failing to properly and adequately train and supervise subordinate employees, in violation of 28 CFR § 115.31.

157.    The individually named defendants acted with deliberate indifference to Plaintiff's constitutional rights. As a result of defendants' conduct, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress.

158.    Plaintiff is entitled to damages to compensate her for these injuries.

159.    Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

160.    Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

### COUNT III

**(42 U.S.C. §1983 – Eighth Amendment – Delay and Denial of Essential Medical Care)**

**(Against Defendants Highberger, Gates, Thomas, Lynch, Balogun, and Bristol)**

161.    Plaintiff realleges all previous paragraphs as if more fully set forth herein.

162.    Plaintiff is entitled to timely and adequate medical/psychological care as part of her Constitutionally guaranteed conditions of confinement pursuant to the 8th Amendment to the United States Constitution. Failure to provide timely and adequate medical care is a violation of the 8th Amendment prohibitions against cruel and unusual punishment. Furthermore, the PREA defines additional mandates for treatment after a sexual assault which is guaranteed to each prisoner.

163.    Plaintiff was denied psychological treatment, counseling, and mental health care as required by state and federal law following her reported rapes and sexual assaults and during her confinement to disciplinary segregation.

164.    Plaintiff is entitled to timely unimpeded access to appropriate mental health evaluation, mental health evaluation including suicide risks, and mental health services follow-up as needed pursuant to federal and state law and the 8th Amendment to the United States Constitution.

165.    Defendants Highberger, Gates, and Thomas denied Plaintiff mental health evaluations, adequate mental health treatment, confidential access to PREA advocates, and any and all follow-up to address her psychological trauma resulting from the rapes, physical assaults, and psychological abuse and as required by law.

166.    As a result of the failures by defendants herein, Plaintiff suffered ongoing psychological trauma as she was denied treatment she required. Her psychological condition has deteriorated and been exacerbated by the numerous failures of defendants here.

167.    Plaintiff was denied timely, adequate, and proper medical care both before and after her August 18, 2020, visit to the hospital for her eye condition.

168.    Plaintiff was denied access to proper medical care and vision correction when she was forced to continue wearing improper and dangerous contact lenses because defendants failed to provide follow-up ophthalmologic care and access to contact lenses or glasses.

169.    Defendants Balogun, Lynch, and Bristol denied timely and adequate ophthalmologic care, prescription refills and monitoring, access to glasses or safe and proper contact lenses, and medical treatment.

170.    The individually named defendants acted with deliberate indifference to Plaintiff's constitutional rights. As a result of defendants' conduct, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress.

171.    Plaintiff is entitled to damages to compensate her for these injuries.

172.    Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

173.    Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT IV

**(42 U.S.C. 1983 – Violation of 5th & 14th Amendments – Due Process)**

**(Against Defendants Highberger, Wagner, Golden, Sandlin, Wallace, Long, and Does)**

174.    Plaintiff re-alleges all relevant paragraphs as though fully restated herein.

175.    The Fifth Amendment to the U.S. Constitution applies to the States through the Fourteenth Amendment. Through its due process clause, the Fifth Amendment the rights to due process of law, both procedurally and substantively.

176.    By taking the actions described above, including but not limited to using solitary confinement, unnecessarily and unreasonably delaying the investigation into the April 2021 allegations, falsely backdating the documentation of Plaintiff's Administrative hearing for the April 2021 allegations, falsely accusing and finding Plaintiff guilty of non-assaultive sexual activity despite contradicting evidence, refusing to show Plaintiff the evidence against her during the October 25, 2021 hearing, conducting constitutionally deficient investigative and hearings processes, and giving and validating prolonged arbitrary solitary detention lengths without meaningful process, Defendants intentionally violated Plaintiff's right to be free unlawful deprivation of due process.

177.    Defendants violated the Constitutional and statutory rights held by Plaintiff in the following ways:

a) Placing Plaintiff in DSU beginning April 2, 2021, based on improbable, unsubstantiated allegations by another AIC known to have a history of making false PREA accusations to manipulate housing assignments;

b) Leaving Plaintiff in DSU for 11 weeks unnecessarily and unreasonably and without proper administrative review processes;

c) Falsifying the date on the paperwork for Plaintiff's eventual administrative hearing to appear that the hearing occurred earlier than it actually did;

d) Issuing the October 12, 2021, misconduct report accusing Plaintiff of participating in non-assaultive sexual activity and falsely claiming the Defendant Wagner had reviewed all available video footage to corroborate the allegation of prohibited conduct;

e) Conducting the resulting disciplinary hearing whereby Defendant Golden falsely claimed that he had reviewed all available video footage to corroborate the allegation of prohibited conduct, and finding Plaintiff guilty of conduct in which she did not engage;

f) Refusing to present Plaintiff with the evidence purporting to depict the prohibited conduct for which Defendant Golden found her guilty;

g) Refusing to allow an appeal or conduct any type of administrative review of the October discipline against Plaintiff.

178.    Defendants' actions were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages in an amount sufficient to punish defendants and to deter others from like conduct.

179.    As a result of Defendants' unreasonable deprivation of Plaintiff's rights without due process, Plaintiff suffered and continues to suffer loss of privileges, loss of access to programming, humiliation, anxiety, distress, isolation, and impairment of her personal dignity and right to be free from discrimination or interference with her statutory rights.

180.    Plaintiff is entitled to compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of access to programming, loss of privileges, and other non-pecuniary losses in an amount to be proven at trial, here alleged to be $1,500,000. Plaintiff should also be entitled to award of her economic loss in an amount to be proved at trial, here alleged to be $10,000.

## COUNT V

## (42 U.S.C. 1983 – Violation of 1st Amendment – Retaliation)

## (Against Defendants Highberger, Golden, Warren, Sandlin, Wallace, Plante, Long, Does)

181.    Plaintiff re-alleges all relevant paragraphs as though fully restated herein.

182.    The First Amendment to the U.S. Constitution applies to the States through the Fourteenth Amendment. The First Amendment prohibits retaliation against inmates by staff because the inmate has engaged in protected activity, such as filing grievances and invoking legal rights.

183.    By taking and allowing the actions described above, including charging Plaintiff with Sexual Assault and Non-Assaultive Sexual Activity because she had maintained notes about to staff actions relating to her state habeas corpus claim, communicated with law library staff regarding her intent to bring a PREA claim, naming specific staff members in her communications with AIC law library staff related to her habeas corpus case and PREA case, filed grievances, and reported Defendants' unlawful conduct, Defendants intentionally

violated Plaintiff's rights to be free from retaliation for engaging in First Amendment protected activity.

184.    Defendants violated the Constitutional and statutory rights held by Plaintiff in the following ways:

a) Confiscating and reviewing confidential, privileged materials belonging to Plaintiff and relating to Plaintiff's legal activities adversarial to ODOC and its staff, which AIC Wilson temporarily held as allowed by policy and administrative rule;

b) Sharing the contents of Plaintiff's confidential and privileged legal materials with others within ODOC, including staff members named in Plaintiff's confidential documents;

c) Placing Plaintiff in DSU unnecessarily beginning on April 2, 2021, based on improbable, unsubstantiated allegations by another AIC known to have a history of making false PREA accusations to manipulate housing assignments as retaliation for Plaintiff's protected legal activities discovered by Defendant Plante;

d) Deliberately delaying investigation into the allegations against Plaintiff and confining Plaintiff in DSU for 11 weeks unnecessarily and unreasonably and without proper administrative review processes as retaliation for Plaintiff's protected legal activities discovered by Defendant Plante;

e) Falsifying the date on the paperwork for Plaintiff's eventual administrative hearing to appear that the hearing occurred earlier than it actually did;

f) Issuing the October 12, 2021, misconduct report accusing Plaintiff of participating in non-assaultive sexual activity and falsely claiming the Defendant Wagner had reviewed all available video footage to corroborate the allegation of prohibited conduct as retaliation for Plaintiff's protected legal activities discovered by Defendant Plante;

g) Conducting the resulting disciplinary hearing whereby Defendant Golden falsely claimed that he had reviewed all available video footage to corroborate the allegation of prohibited conduct, and finding Plaintiff guilty of conduct in which she did not engage as retaliation for Plaintiff's protected legal activities discovered by Defendant Plante;

h) Refusing to present Plaintiff with the evidence purporting to depict the prohibited conduct for which Defendant Golden found her guilty;

i) Refusing to allow an appeal or conduct any type of administrative review of the October discipline against Plaintiff as retaliation for Plaintiff's protected legal activities discovered by Defendant Plante.

185. As a result of Defendants' retaliation against Plaintiff, Plaintiff suffered and continues to suffer loss of privileges, loss of access to programming, humiliation, anxiety, distress, isolation, and impairment of her personal dignity and right to be free from discrimination or interference with her statutory rights.

186. Plaintiff is entitled to compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of access to programming, loss of privileges, and other non-pecuniary losses in an amount to be proven at trial, here alleged to

be $1,500,000. Plaintiff should also be entitled to award of her economic loss in an amount to be proved at trial, here alleged to be $10,000.

**COUNT VI**

**(Negligence)**

**(Against ODOC)**

187.    Plaintiff re-alleges all previous relevant paragraphs as if fully stated herein.

188.    Defendants knew or should have known that A.O. presented a substantial risk to Plaintiff's safety. Because of ODOC's failure to protect Plaintiff, she suffered physical harm and severe physical and mental pain and suffering.

189.    ODOC failed to use reasonable care in housing Plaintiff and protecting her from physical and sexual assaults by other prisoners on the basis of her sex and gender as alleged above. ODOC's conduct was negligent.

190.    Defendant ODOC owes Plaintiff a higher standard of care because of the nature of incarceration. As wards of the State, Defendant ODOC manages all aspects of Plaintiff's daily life and decides with whom she will interact, where he will work, live, sleep, bathe, use the toilet, recreate, etc. Had Plaintiff been a free person, she would have been able to avoid A.O. But as an incarcerated person, defendant ODOC prevented Plaintiff from being able to take these measures.

191.    Defendant ODOC voluntarily took the custody of Plaintiff under circumstances such as to deprive her of normal opportunities for protection and created a non-delegable duty to ensure that Plaintiff was safe from violence and discrimination on the basis of sex at the hands of other inmates. Defendants failed to meet their obligation to protect Plaintiff from known, obvious, and predictable threats to her safety.

192.    ODOC's conduct was unreasonable in light of the risk of harm to Plaintiff. ODOC controlled all aspects of Plaintiff's life. Plaintiff's harms could have easily been prevented if CCIC and OSCI staff had properly identified Plaintiff as being vulnerable to sexual violence and had properly identified A.O. as being a violent inmate; if Plaintiff was not housed with A.O.; if OSCI staff had properly conducted a PREA investigation and implemented proper mechanisms to protect Plaintiff from future contact with A.O. in June 2020; if ODOC, OSP, and OSCI had implemented adequate emergency evacuation plans to protect AICs should an emergency evacuation take place; if ODOC, OSCI, and OSP had properly protected Plaintiff from contact with A.O. while OSCI prisoners were house at OSP; if ODOC staff had conducted proper mail monitoring and "blocks" of A.O.'s outgoing mail after Plaintiff reported the assaults against her;  and if defendants had not placed a vulnerable transgender female prisoner in a men's prison without sufficient supervision and protection. This was unreasonable.

193.    As a direct and proximate result of ODOC's negligence, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress. Plaintiff should be fully and fairly compensated for her damages in a sum that is just as determined by a jury.

194.    Plaintiff satisfied the Oregon Tort Claims Act notice requirement by filing a Tort Claim notice in October 2021.

195.    Plaintiff is entitled to a prevailing party fee, her costs and disbursements.

### PRAYER FOR RELIEF

Plaintiff prays for the following judgment against Defendants:

**A.**    A sum which will fully compensate Plaintiff for her physical pain and suffering;

**B.**    A sum which will compensate plaintiff for her emotional distress;

**C.**     A sum which will fully compensate plaintiff for her economic losses;

**D.**     An award of punitive damages;

**E.**     For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

**F.**     Equitable relief; and

**G.**     For such other and further relief as the Court may deem just and equitable.

**Plaintiff demands a trial by Jury.**

Dated: February 27, 2022

LAW OFFICES OF DANIEL SNYDER

s/ Katharine Edwards
Katharine Edwards, OSB No. 173393
attorney@kedwards-law.com
John Burgess, OSB No. 106498
johnburgess@lawofficeofdanielsnyder.com
Of Attorneys for Plaintiff